**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR-14-678-PHX-GMS (DKD) |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Joseph S. Martin; Christopher J. Heikkila, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The Government seeks the detention of Defendants Joseph S. Martin ("Martin") and Christopher J. Heikkila ("Heikkila") on the grounds that each of them is a serious flight risk, a danger to the community, and no release condition or combination of conditions exist that would reasonably assure their appearances at future court proceedings if they were released. *See* the Government's Motion for Detention and Removal to the United States, initially filed under seal on May 19, 2014, and, as a public document, on May 22, 2014.[1] (Docs. 10, 16) The matter has been under advisement since May 29, 2014, pending the Court's review of post-hearing memoranda and analysis of the detention factors in 18 U.S.C. § 3142(g).

After considering the Government's and each Defendant's separate detention briefings; all the evidence and proffers at the detention hearing held over two days; the

---

[1] After the motion was unsealed, the Government was directed to re-file the motion in text-searchable format per LRCrm 12.1, LRCiv 7.1(c), and definition of ".pdf," in the District Court's ECF Manual, at I(A), p. 2. (Doc. 15)

arguments of counsel; the controlling and persuasive authorities on the issues *sub judice* and all the factors set forth in 18 U.S.C. § 3142(g), the Court finds that the Government has proven by a preponderance of the evidence that each of the Defendants is a serious flight risk and no combination of conditions exist that would reasonably assure their appearance at future court proceedings if they were released from custody. Defendants shall remain detained pending resolution of this case.

**I. Background**

Defendants Martin and Heikkila, each 19 years of age, were indicted by a Phoenix federal grand jury on May 14, 2014, and charged with Conspiracy to Commit Aggravated Sexual Abuse, Sexual Abuse, and Abusive Sexual Contact (Count 1), a Class A felony, in violation of 18 U.S.C. §§ 371, 2241(b)(1), 2242(2)(B), 2244(a)(2), and 3261(a)(1); Sexual Abuse (Count 2), a Class A felony, in violation of 18 U.S.C. §§ 2242(2)(B), 2246(3), 3261(a)(1), and 2; Abusive Sexual Contact, (Count 3), a Class E felony, in violation of 18 U.S.C. §§ 2244(a)(2), 2246(3), 3261(a)(1), and 2. *See* 18 U.S.C. § 3559(a), (1)-(5).[2] (Doc. 3)  Upon the grand jury's finding of probable cause, the sexual abuse charge raises a statutory rebuttable presumption "that no condition or combination of conditions will reasonably assure  the appearance of the [defendant] as required and the safety of the community[.]" 18 U.S.C. § 3142(e)(3)(E) (citing, among others, section 2242); *see also United States v. McCarty*, 2009 WL 5061577 (D. Haw. Dec. 24, 2009); *United States v. O'Field*, 2009 WL 920734 (N.D. Okla. March 27, 2009).

The crime of Sexual Abuse, under 18 U.S.C. § 2242(2)(B), has the following elements: 1) the defendant knowingly engaged in a sexual act with the victim; 2) the victim

---

[2]  "[S]ection 3559 classifies felonies by their maximum sentence, with A felonies being the most serious and E felonies being the least. For example, crimes with a maximum sentence of life imprisonment or death are Class A felonies, whereas crimes with a maximum sentence of less than five years but more than one year are Class E felonies." *United States v. Broussard*, 611 F.3d 1069, 1071 (9th Cir. 2010).

1    was physically incapable of declining participation in, or communicating unwillingness to

2    engage in, that sexual act; and, 3) the offense was committed within the special meritime and

3    territorial jurisdiction of the United States. *See United States v. Fasthorse*, 639 F.3d 1182,

4    1184 (9th Cir. 2011); *United States v. James*, 2013 WL 5423979, at *2 (D. Ariz. Sept. 26,

5    2013) ("Section 2242 was enacted in 1986 . . . , which was intended to modernize and reform

6    the federal rape statutes.").

7        Federal courts have held that sexual abuse may occur when the victims are

8    incapacitated by alcohol or asleep. *See United States v. Stamper*, 507 Fed. Appx. 723, 724

9    (9th Cir. 2013) ("In sexual assault cases, 'a reasonable jury may conclude that a person who

10   is asleep when a sexual act begins is physically unable to decline participation in that act.")

11   (citing *Fasthorse*, 639 F.3d at 1184) (alteration omitted), *cert. denied*, 133 S.Ct. 2840 (2013);

12   *United States v. Barrett*, 937 F.2d 1346, 1348 (8th Cir. 1991) (sustaining conviction for

13   sexual abuse where the victim was physically incapable of declining participation in, or

14   communicating unwillingness to engage in, the sexual act until after the act was complete

15   when the testimony showed the victim was intoxicated and extremely tired, vaguely

16   remembered someone pulling down her jeans and underwear, once fully awake, she realized

17   defendant was on top of her and his penis was inside her vagina, and she immediately pushed

18   defendant off her and ran out of the room).

19       A defendant commits the offense of abusive sexual contact, in violation of 18 U.S.C.

20   § 2244(a)(2), when the defendant "knowingly engages in or causes sexual contact with or by

21   another person, if to do so would violate . . . section 2242 of [Title 18] had the sexual contact

22   been a sexual act."[3] As previously mentioned, a violation of 18 U.S.C. § 2242(2) occurs

23

24   ─────────────

25   [3] Title 18 U.S.C. § 2244(a)(2) provides: "Whoever, in the special . . . territorial jurisdiction of the United States . . . knowingly engages in or causes sexual contact with or

26   by another person, if so to do would violate . . . section 2242 of this title had the sexual contact been a sexual act, shall be fined under this title, imprisoned not more than three

27   years, or both."

28

where a person "knowingly . . . (2) engages in a sexual act with another person if that other person is . . . incapable of appraising the nature of the conduct; or physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act[.]" 18 U.S.C. § 2242(2).

The terms "sexual act" and "sexual contact" referred to in sections 2242 and 2244 are defined in 18 U.S.C. § 2246. A "sexual act" involves penile-genital contact, oral-genital contact, or genital penetration. 18 U.S.C. § 2246(2). "Sexual contact" means "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3).

The subject indictment alleges the crimes occurred in Landstuhl, Germany, which is near Ramstein Air Force Base, on or about October 19, 2013. The Government represents this criminal case involves the sexual assault and rape of a 17-year-old girl ("Jane Doe") while she was incapacitated due to voluntary intoxication. At the time the crimes were allegedly committed, Jane Doe and Defendants lived in Germany where the alcohol drinking age is 16 years for beer and wine and 18 years, the age of adulthood, for all other alcohol.[4] (Doc. 16 at 3) The Government's investigation involved the interview of numerous individuals, including Defendants, Jane Doe, certain confidential witnesses, and a search and review of Defendants' messages sent to each other on Facebook[5] and Twitter.[6] According to

---

[4] "The German laws regulating alcohol use and sale are some of the least restrictive ones in the world." *See* www.wikipedia.org/Alcohol_laws_in_Germany (last viewed on June 3, 2014).

[5] "Facebook is an online social networking service. Its name comes from a colloquialism for the directory given to students at some American universities. . . Facebook now allows anyone who claims to be at least 13 years old worldwide to become a registered user of the website, even though proof isn't required." *See* www.wikipedia.org/wiki/Facebook (last viewed on June 3, 2014) (footnotes omitted).

[6] "Twitter is an online social networking and microblogging service that enables users to send and read short 140-character text messages, called 'tweets'." *See* www.wikipedia.org/wiki/Twitter (last viewed on June 3, 2014).

the Government, in their Facebook messages, Defendants "[a]ppeared to plan the sexual assault of Jane Doe. Specifically, the defendants sent messages that included a discussion of who would engage in sexual activity with Jane Doe, how to get Jane Doe drunk at an upcoming party, and where the assault would occur." (*Id.*)

On May 14, 2014, arrest warrants were issued by the Clerk of the District Court of Arizona. (Docs. 7-8)  Defendants were arrested in Germany shortly thereafter, returned to the United States and, on May 19, 2014, appeared before Phoenix Magistrate Judge John A. Buttrick, when counsel were appointed, pleas of not guilty entered, and each Defendant temporarily detained pending a detention hearing, which began on May 27, 2014.[7] (Docs. 13-14, 21-23)

### A. Jurisdiction and Venue

The Government asserts jurisdiction over the indicted offenses pursuant to the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. §§ 3261-3267, which subjects certain individuals to prosecution in federal district courts for felonies committed outside the United States, if the offense would have been subject to federal prosecution within the special maritime and territorial jurisdiction of the United States, and the offense is punishable by imprisonment for more than one year. *See United States v. Arnt*, 474 F.3d 1159, 1161 (9th Cir. 2007). The categories of individuals who can be subject to federal prosecution pursuant to MEJA include, *inter alia*, individuals who are "employed by or accompanying the Armed Forces outside the United States." 18 U.S.C. § 3261. As alleged in the indictment, Martin and Heikkila were employed by and accompanied the Armed Forces in Germany at the time of the offenses were allegedly committed. (Doc. 3, ¶ 4 at 2)

### B. Venue

Venue presumptively exists in the District of Arizona pursuant to 18 U.S.C. § 3238, because the conduct in the indictment allegedly occurred outside the jurisdiction of any

---

[7] Defendants were initially detained in a U.S. military correctional facility in Germany until their delivery to the United States Marshals Service in Chicago, and arrived in Phoenix on May 22, 2014.

1  particular State or District and the last known residence of Martin was Peoria, Arizona. (*Id.*,
2  ¶ 7 at 2)

3      The Government has asserted in an unsealed search warrant affidavit that Martin was
4  employed by the Armed Forces outside the United States, as defined by Title 18, United
5  States Code, § 3267(1), as a clerk at the Army & Air Force Exchange, on the Ramstein Air
6  Force Base, a non-appropriated fund instrumentality of the Department of Defense. *See* May
7  6, 2014 search warrant application and affidavit, ¶ 18 at C-7. According to the Government,
8  Heikkila was residing in Weilerbach, Germany,  and was also employed by the Armed
9  Forces outside the United States, as defined by Title 18, United States Code, Section 3267(1),
10  as a clerk at the Army & Air Force Exchange in Ramstein, Germany. *Id.*, ¶ 19. Both
11  Defendants are U.S. citizens.

12  **II. The Bail Reform Act of 1984**

13      "The Bail Reform Act [the "Act"], 18 U.S.C. §§ 3141-3150, authorizes and sets forth
14  the procedures for a judicial officer to order the release or detention of an arrested person,
15  pending trial, sentence, and appeal." David N. Adair, Jr., Federal Judicial Center, *The Bail*
16  *Reform Act of 1984*,  p. vii (3rd Ed. 2006).  The Act mandates the release of a person pending
17  trial unless the court "[f]inds that no condition or combination of conditions will reasonably
18  assure the appearance of the person as required and the safety of any other person and the
19  community." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (quoting 18 U.S.C.
20  § 3142(e)); *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United*
21  *States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). Conversely stated, "[a] district
22  court may not order pretrial release unless it determines that a 'condition or combination of
23  conditions will reasonably assure the appearance of the person as required and the safety of
24  any other person and the community.'" *United States v. Langenhorst*, 130 Fed. Appx. 892,
25  893 (9th Cir. 2005) (reversing district judge's order releasing the defendant from detention).
26  A district court engages in a two-step inquiry before ordering a defendant either released or
27  detained pending trial. *See United States v. Gentry*, 455 F.Supp.2d 1018, 1020 (D. Ariz.
28  2006) (citation omitted). First, a district court must make a finding that, if released from

custody, whether a defendant is a danger to "the safety of any other person and the community," and/or there is "a serious risk [the defendant] will flee[.]" 18 U.S.C. §§ 3142(f)(1)(A)-(E), 3142(f)(2)(A)).  Second, if a defendant poses a danger to the community and/or is a serious risk to flee, the district court must determine whether some set of conditions would sufficiently vitiate these risks. *See* 18 U.S.C. § 3142(g). The burden of proof rests with the Government, which must establish serious risk of flight by a preponderance of the evidence, and dangerousness by the higher standard of clear and convincing evidence for detention on the basis of danger. *See Motamedi*, 767 F.2d at 1406.

If a defendant rebuts the presumption of detention that arises under section 3142(e)(3), the presumption is not erased; "[r]ather the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3242(g).'" *Hir*, 517 F.3d at 1086 (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)). If a defendant proffers evidence to rebut the presumption of serious flight risk and dangerousness, a district court then considers the four factors in Section 3142(g):

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g). The weight to be accorded to each of these factors rests in the district court's discretion. *See Gentry*, 455 F.Supp.2d at 1020 (citing *United States v. Hollender*, 162 F.Supp.2d 261, 264 (S.D.N.Y. 2001)). If released, the combination of release conditions must

1   be the "least restrictive" that will reasonably assure a defendant's appearance at future court

2   proceedings as required. *See* 18 U.S.C. § 3142(c)(B); *Motamedi*, 767 F.2d at 1405.

3   Reminding district courts of the presumption of innocence and its corollary that the right to

4   bail should be denied only for the strongest of reasons, the *Motamedi* court indicated that

5   "[o]nly in rare circumstances should release be denied," and any "[d]oubts regarding the

6   propriety of release should be resolved in favor of the defendant." *Id.*

7       Although conditions of release may be imposed, "[t]hey contain one critical flaw. In

8   order to be effective, they depend on [a defendant's] good faith compliance." *Hir*, 517 F.3d

9   at 1092 (citing *United States v. Tortora*, 922 F.2d 922 F.2d 880, 886 (1st Cir. 1990)

10  (concluding that a similarly extensive set of release conditions contained "an Achilles' heel

11  . . . virtually all of them hinge on the defendant's good faith compliance").

12  **III. Danger and/or Risk of Flight**

13      To appreciate whether Defendants pose a danger to the safety of any other person and

14  the community, or constitute serious flight risks, the Court will begin with a discussion of

15  the factual details warranting the findings of probable cause of the charged crimes based on

16  statements provided to law enforcement by the victim, Defendants, and third-party witnesses

17  and other evidence presented at or for the detention hearing.

18      **A. Jane Doe**

19      According to the Government, Jane Doe was interviewed by law enforcement officers

20  and provided the following information. On or about October 19, 2013, she attended her

21  high school homecoming dance and later attended an "after party" at another student's home

22  in Landstuhl. (Doc. 16 at 3)  Jane Doe purportedly informed law enforcement that while at

23  the party, she consumed several alcoholic beverages including beer, vodka, and some juice

24  that was already made and contained alcohol. Jane Doe stated Martin approached her soon

25  after she arrived at the party and started "small talk" with her. Jane Doe remembers drinking,

26  at least, one drink provided by Martin early on at the party. (*Id.* at 4)  She described the drink

27  as a small bottle of an unknown alcohol that had already been opened. She could not

28  remember what kind of alcohol it was, but stated it looked like the ones sold in convenience

1    stores containing about 1.5 ounces of alcohol.

2        At an unknown time, Jane Doe reported that she lost consciousness and awoke in the

3    backseat of an unknown car. (*Id.*) Heikkila was knocking on the window. Jane Doe realized

4    she was naked and Martin was in the back seat of the car with her. She felt as though

5    someone had penetrated her vagina with something. She stated she could not remember

6    getting dressed and did not know how she got into the car that took her home. (*Id.*)

7        **B. Martin**

8        The Government informs the Court that, on November 6, 2013, Martin was

9    interviewed by law enforcement officers. No information has been provided the Court

10   whether the interview was recorded or who was present during the interview. The

11   Government claims Martin admitted that both he and Heikkila engaged in sexual activity

12   with Jane Doe at the party and that she was intoxicated and incapable of consenting to any

13   sexual act or contact. (*Id.*)  Martin explained that he kissed Jane Doe briefly while they were

14   inside the party, but she abruptly stopped and walked away. He stated that when she walked

15   away, he was "confused and depressed" and he was "disappointed" because he did not have

16   another girl to be with that night. He added that he "wanted to get with" Jane Doe that night

17   but he "did not want to have sex with her while she was so drunk." (*Id.*) Martin stated that

18   after he kissed Jane Doe, he and Heikkila talked about her. Heikkila told him that she was

19   "pretty drunk" so Martin should "do it" or he [Heikkila] would. Martin understood Heikkila

20   to mean that Martin should have sex with Jane Doe or Heikkila would. Martin then admitted

21   to law enforcement that he "knew it was wrong to have sex with her because she was so

22   drunk but I just did it because C.J. [Heikkila] pressured me to." (*Id.* at 4-5)

23       The Government represents that Martin explained to law enforcement that around

24   1:00 a.m. on October 20, 2013, he and Heikkila assisted Jane Doe out of the party. Martin

25   was on one side of her and Heikkila was on the other because Jane Doe could not walk on

26   her own. (*Id*. at 5) At one point, one of them let go of Jane Doe's arm and they caught her

27   before she fell down to the ground. In addition, on the way to the car, Jane Doe vomited. (*Id.*)

28   When they arrived at Heikkila's car, Martin and Heikkila laid Jane Doe down in the back

1   seat with her feet hanging out of the car on the ground. Heikkila got in first and started to kiss
2   Jane Doe. Heikkila told Martin that he would only take 10 minutes because he knew that
3   Martin wanted to have sex with her when he was done. (*Id.*) Martin stated that while Heikkila
4   was in the car, Jane Doe appeared to just be "lying there."  Martin then told Heikkila to stop
5   because his time was up and it was his turn with Jane Doe. (*Id.*)  Heikkila did not stop so
6   Martin went back to the party to gather some friends to get Heikkila to stop. As Martin
7   arrived back at the party, Heikkila returned, too, and told Martin he was done. (*Id.*)

8       Martin and Heikkila then returned to the car. Jane Doe was still lying in the same
9   position with her feet hanging out of the car and the door open. Heikkila climbed onto the
10  trunk of the car to act as a "look-out" as Martin climbed on top of Jane Doe and started to
11  kiss her. Martin admitted that he proceeded to touch her breasts over her clothes and under
12  her clothes, he performed oral sex on Jane Doe, he digitally penetrated her vagina with his
13  fingers, he removed all of her clothes, and then engaged in vaginal intercourse with her, both
14  with and without a condom. (*Id.*)  According to the Government, Martin initially told law
15  enforcement that Jane Doe stroked his penis and "most of the time she was helping my penis
16  and making sure it was penetrating her."  Later, however, he informed law enforcement that
17  in order to have intercourse with her, Martin used his own hands to guide his penis into Jane
18  Doe's vagina. (*Id.*) He admitted that at times while he was performing various sex acts on
19  Jane Doe, she was passed out. (*Id.* at 5)  Martin stated that she was "kind of breathing and
20  moving around but I guess everyone does that when they sleep." Martin also admitted that
21  at no time did Jane Doe tell him that he could have sex with her. (*Id.*)

22      **C. Heikkila**

23      The Government informs the Court that Heikkila was also interviewed by law
24  enforcement on November 6, 2013. No information has been provided the Court whether the
25  interview was recorded or who was present during the interview. Omitting duplicative
26  statements for brevity purposes only, the Government indicates that Heikkila told law
27  enforcement that he observed Martin talk to Jane Doe, give her a drink, and play beer pong
28  together. (*Id.* at 6) Heikkila stated that the three of them left the party together and walked

to his car where Heikkila asked Jane Doe if she wanted to lay down in his car because it was cold outside. Heikkila purportedly told law enforcement he then asked Jane Doe how she was doing and if it would be weird if they kissed. Jane Doe said that she was feeling better and it would not be weird if they kissed. Heikkila then entered the car and kissed Jane Doe for approximately 3-5 minutes. Heikkila claimed he asked Jane Doe while they were kissing if she knew who he was and what they were doing. Heikkila said she did not respond at first and then she opened her eyes and said, "you're C.J." and "we're kissing." (*Id.*) Thereafter, Heikkila allegedly admitted he continued to kiss Jane Doe; touched her breasts, both over and under her clothes; and touched her "pelvic area" between her waist-line and her vagina.

The Government reports that Heikkila claimed "he stopped [presumably having sex with Jane Doe] when he saw Martin outside with three other males from the party." (*Id.*) Heikkila reported he exited the vehicle and saw that Martin was upset. (*Id.*) Heikkila then allegedly said to Martin, "Either you go do it, or I will." Heikkila explained to law enforcement that he meant that either Martin should have sex with Jane Doe or he [Heikkila] was going to have sex with her. Heikkila then observed Martin get in the car with Jane Doe. He saw Martin perform oral sex on Jane Doe, then put on a condom, and engage in sexual intercourse with Jane Doe. (*Id.* at 7)

According to the Government, Heikkila also admitted to sending a message via his Twitter account while Martin was having sex with Jane Doe. (*Id.*)  The tweet read, "lol my nigga gettin it." Heikkila confirmed he was talking about Martin having sex with Jane Doe. (*Id.*)

**D. Witnesses**

The Government's investigation also included interviewing, at least, two 18-year old male acquaintances of Martin and Heikkila, who were at the party. Described as Confidential Witness #1 and #2 in the Government's motion, *id*, these witnesses corroborate seeing Jane Doe in the vehicle's back seat and that she appeared to be passed out. Confidential Witness #2 purportedly told law enforcement that Martin came to him and CW-1 during the party and told them that "'C.J.' [Heikkila] was raping Jane Doe."  (*Id.*) CW-2 and CW-1 left with

- 11 -

1   Martin to go to the car. When they arrived, Heikkila was getting out of the car where Jane

2   Doe was lying in the backseat. Heikkila told them that nothing was going on and he was "not

3   raping" Jane Doe. (*Id.*) CW-2 then saw Martin get in the car with Jane Doe. CW-1 then left.

4          In light of the grand jury's finding of probable case that Defendants committed the

5   crime of Sexual Abuse, a statutory rebuttable presumption arises that no condition or

6   combination of conditions will reasonably assure the safety of the community and the

7   appearance of Defendants as required if released. *See* 18 U.S.C. § 3142(e)(3)(E) (citing,

8   among others, section 2242 as an "offense involving a minor victim"); *see also McCarty*,

9   2009 WL 5061577; *O'Field*, 2009 WL 920734. Thus, at this initial stage of the detention

10  analysis, the Court finds that Defendants are both a danger to the community and serious

11  flight risks and must be detained pending trial.

12  **IV. Factors to Consider Regarding Safety and Appearance**

13          **1. Nature and Circumstances of the Crimes Charged**

14          The crimes of sexual abuse, 18 U.S.C. §§ 2242(2)(B), 2246(3), and abusive sexual

15  contact, 18 U.S.C. §§ 2244(a)(2), 2246(3), are each a "crime of violence," as defined by 18

16  U.S.C. § 3156(a)(4).[8]  While the Ninth Circuit has not specifically addressed whether either

17  of these crimes are crimes of violence within the context of the Bail Reform Act, it has

18  determined that abusive sexual contact under 18 U.S.C. § 2244(a)(3) is a crime of violence

19  within the meaning of U.S. Sentencing Guidelines. *See United States v. Granbois*, 376 F.3d

20  993, 996 (9th Cir. 2004); *United States v. Pereira-Salmeron*, 337 F.3d 1148 (9th Cir. 2003)

21  (explaining that crimes involving the sexual abuse of a minor are *per se* "crimes of

22  violence."). The *Granbois* court specifically noted that "[w]hether non-forcible sexual

23

24          [8] Under the Bail Reform Act, a "crime of violence" is defined as "[a]n offense that

25  has [as] an element of the offense the use, attempted use, or threatened use of physical force
    against the person . . . [or] "a felony and that, by its nature, involves a substantial risk that

26  physical force against the person . . . may be used in the course of committing the offense;

27  or . . . any felony under chapter *109A*, 110, or 117[.]" 18 U.S.C. § 3156(a)(4)(A)-(C)
    (emphasis added). Title 18 U.S.C. §§ 2242(2)(B), 2246(3) are located in chapter 109A of the

28  federal criminal code.

1   contact between a nineteen-year old and a fifteen-year old actually presents a serious risk of

2   physical injury to another is a question we need not decide." 376 F.3d at 995.

3       Here, there are no allegations of distribution of controlled substances or the possession

4   or use of a firearm or dangerous instrument, but, of course, Jane Doe was a minor when the

5   crimes in the indictment were allegedly committed. The Tenth Circuit has written that

6   "[c]ases involving sex crimes against minors, are considered violent crimes because there is

7   always a substantial risk that physical force will be used to ensure a child's compliance with

8   an adult's sexual demands." *United States v. Grigsby*, 270 Fed. Appx. 726 (10th Cir. 2008)

9   (defendant convicted of Aggravated Sexual Abuse of a Minor in Indian Country, in violation

10  of 18 U.S.C. § 1151, 1153, 2241, and 2246(2)(C)) (quoting *United States v. Munro*, 394 F.3d

11  865, 870 (10th Cir. 2005) (internal quotation marks omitted). In *Grigsby*, the court found that

12  the "charged crime [Aggravated Sexual Abuse of a Minor] meets the definition of 'crime of

13  violence' under the Bail Reform Act, 18 U.S.C. § 3156(a)(4)(B).")." *Id.*; *see also United States v. Abraham*, 2006 WL 3145993, at *1 (W.D. Pa. Oct. 31, 2006) (finding crimes

14  *States v. Abraham*, 2006 WL 3145993, at *1 (W.D. Pa. Oct. 31, 2006) (finding crimes

15  involving child pornography, and other felonies under chapter 110,  are crimes of violence

16  under the Bail Reform Act) (collection of cases omitted).[9]

17      The Court finds that the crimes of Sexual Abuse and Abusive Sexual Contact are

18  crimes of violence under the Bail Reform Act. In light of this finding and the very serious

19  nature and circumstances of the crimes charged, the Court concludes that the first section

20  3142(g) factor strongly favors the Government's request that Defendants remain detained.

21      **2. Weight of the Evidence against Defendant**

22      Of the four detention factors a district court must consider, the Ninth Circuit has

23  instructed that the weight of the evidence is the least important factor. *Motamedi*, 767 F.2d

24  _____

25      [9] Some federal courts have held that a conspiracy to commit a crime of violence is
26  itself a crime of violence under the Bail Reform Act. *See United States v. Mitchell*, 23 F.3d
    1 (1st Cir. 1994) (conspiracy to commit arson is a violent crime under the Bail Reform Act);
27  *United States v. Chimurenga*, 760 F.2d 400, 403-04 (2d Cir. 1985); *United States v. Greer*,
    939 F.2d 1076, 1099 (5th Cir. 1991), (§ 924(c); conspiracy to deprive citizens of civil
28  rights), *aff'd en banc*, 968 F.2d 433 (5th Cir. 1992), *cert. denied*, 507 U.S. 962 (1993).

1    at 1407; *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972).

2          The strength of the Government's case against the Defendants is "overwhelming," as

3    Government's counsel correctly labeled it during argument at the detention hearing. The

4    interviews of Jane Doe and confidential witnesses corroborate the very damaging admissions

5    each Defendant provided to law enforcement only three weeks after the party. Documentary

6    evidence presented in the Government's detention motion demonstrates Defendants' plan

7    was premeditated, beginning a month before the party, and not spontaneous criminal conduct

8    fueled by alcohol and an overabundance of testosterone. The following exchanges or posts

9    between Defendants were discovered on Facebook pursuant to a federal search warrant

10   regarding their plan to get underage girls drunk at the party and then have sex with them. The

11   posts confirm Martin and Heikkila knew such conduct was illegal and carried a risk of going

12   to jail. The following pre-indictment message excerpts are a treasure trove of information,

13   offering candid insight into relevant detention issues and character traits of Defendants

14   generated before and after the party:

15   **A. Facebook Messages Before the Party Targeting Jane Doe**

16   **1. September 19-20, 2013:**

17   Martin: [MALE MINOR'S NAME REDACTED] having a fucking party.

18   Heikkila: I'm scared about [FEMALE MINOR's NAME REDACTED]

19   Martin: Why lolz

20   Heikkila: If we mess around . . . I could go to jail

21   Martin: Worth it. That 21 year old didn't go to jail. Lmfao[10]

22   Heikkila: I guess we'll see. I'm worried about that kind of stuff with you though.
23   Like, you realize I could go to jail and be labeled a child molester for the rest of my life? Or a sex offender . . . .

24   Heikkila: I need a bro's perspective man.

25   Martin: I guess if you wanna go for it. Like you'd be cool if I had sex with a 13 year old girl if we were deeply in love
26

27   _____

28   [10] "Lmfao" is usually an acronym for "laughing my fucking ass off." (Doc. 16 at 8 n. 2)

- 14 -

Heikkila: 13 . . . . ?

Martin: It's not about the sex. It's about the feels.

Heikkila: That's what I'm sayin. I bet she fucks like a fuckin stallion

(Doc. 16 at 8)

**2. October 2, 2013:**

Martin: have to go to [MALE MINOR's NAME REDACTED] party. I could get all kinds of pussy. RIGHT after homecoming too. That's like putting the fish into a barrel.

Martin: HOODIE[11] AND BOOZE and 17 YEAR OLD VAG [likely meaning "vagina"].

Martin: I'm gonna get all the pussy at the party. Drunk girls are dtaf.[12] Down to assfuck. I have time to fuck a high school bitch.

(*Id.* at 9)

**3. October 3, 2013:**

Martin: These are for the bitches. I'm gonna get some real manly drinks tomorrow. #budlightlimerita

They don't sell those anymore [sad smiley face]

It would get the bitches drunker faster than Smirnoff ice doe.

(*Id.*)

**4. October 7, 2013:**

Heikkila: I want to get laid at this party. Is [FEMALE MINOR's NAME REDACTED] cool?

Martin: Fuck yeah.

Martin: Wouldn't be too hard if you get her high and drunk.

(*Id.*)

**5. October 9, 2013:**

Martin: My brother giving me fucking shit about the hypothetical possibility about the

---

[11] The Government advises that law enforcement believes Martin and Heikkila used the term "hoodie" to refer to illegal drugs, such as, marijuana. (*Id.* at 9 n. 3)

[12] The Government advised the Court during the detention hearing that "dtaf" means "doing the ass fuck."

1    cops coming.

2    Heikkila: To [the party]?

3    Martin: Yeah.

4    Heikkila: Nigga I ain't worried about nothing

5    Martin: Supplying alcohol to minors or some shit.

6    Heikkila: So what? Don't let him ruin it for you

7  (*Id.* at 10)

8    **6. October 11, 2013:**

9    Heikkila: You don't need to get drunk to get some. They do

10    Martin: Ah.

11    Heikkila: Oh, and there aren't any girls going that are of age….

12    Martin: I'll still hit it.

13    Heikkila: Be careful

14  (*Id.*)

15    **7. October 14, 2013:**

16    Martin: I've never wanted something so bad in my whole entire life.

17    Heikkila: True shit nigga. [Jane Doe]?

18    Martin: . . . yes . . . .

19    Heikkila: I hate to say this man . . . If you do, and I'm not like, doing anything with
20    [FEMALE MINOR's NAME REDACTED] . . . I'm goin for it [referring to Jane Doe]….

21    Heikkila: Maybe she'll [referring to Jane Doe] let you put it in her butt. Since she
     won't feel it in her vagina.

22

23    Martin: Fuck you man . . . I don't do that with minors.

     Heikkila: Lol then you aren't getting laid. Jk [just kidding]. If she's drunk enough, she
24    might not even remember.

25    Martin: I better buy anal lube just in case you're right . . . .

26  (*Id.*)

27    **8. October 15, 2013:**

28    Martin: So like . . . How can I get her really drunk [referring to Jane Doe]? I

can't just be handing her drinks every 10 minutes . . . She'll catch on.

Heikkila: Well she is gonna get drunk right away anyways

Martin: Really?

Heikkila: But like, you should just be like, "I'm gonna go get shots". And bring one with water for you.

**9. October 17, 2013:**

Martin: Can I borrow your backseat?

(*Id.*)

**B. Facebook Messages After the Party – Including Jokes About Jane Doe**

**1. October 20, 2013:**

Heikkila: You should've let her [referring to Jane Doe] blow me or something . . . .

Martin: She was too tired to blow . . . .

Heikkila: Or Eiffel Tower! Roberto and I promised each other him and I would do that to her sister. Next best thing, you and me and [Jane Doe] instead! . . . .

Martin: [Discussing a potential message to Jane Doe] This sucks man. "Sorry for getting you incredibly drunk and taking a great deal of advantage of you in my friends car while he was there and many people at your school know. Let's go get spaghetti."

Heikkila: No lol

Martin: I'm not sending that.

Heikkila: Good lol

(*Id.* at 11)

**2. October 22, 2013**

Attached to this Order as Exhibit 1 is a cartoon that was received in evidence at the detention hearing that Martin purportedly sent to Heikkila approximately two days after the crimes were allegedly committed. Below is Heikkila's alleged response.

Heikkila: Lmfaoooo. Too soon…

Martin: It's perfect though

**3. October 23, 2013:**

1    Heikkila: And then once their drunk, "Ay gurl, lets go down to my liar"

2    Martin: Damn. I wish I was you.

3    Heikkila: They always do.

4    Martin: I wish I had a lair.

5    Heikkila: Its a rape lair.

6    Martin: Your backseat has that title already . . . .

7    Heikkila: Nah man. Now its really the "Shag Wagon"

8    Martin: AND I got to be the first. Heheheh.

9    (*Id.* at 12)

10

11   **3. October 25, 2013:**

12   Martin: Rape a white bitch for a one night stand or being able to fap4 for
     eternity… The Joey chose poorly.

13   (*Id.*)

14   **4. October 27, 2013:**

15   Martin: Rapist Joe forgot how to fap.

16   (*Id.*)

17

18   **5. November 6, 2011:**

     Heikkila: I wish I had fucked [FEMALE MINOR's NAME REDACETD]
     when I had the chance. That way we both could've raped an under age girl.

19   Martin: Therapy bros! *high-five*

20   Heikkila: *High Five* WUT. More like, "The Rape-y Bros!"

21   (*Id.*)

22   **C. Facebook Messages About Poisoning Boys at the Party**

23   **1. October 13, 2013:**

24   Martin: Who's fucking [Jane Doe] . . .? Random black dude? . . .

25   Martin: I'm gonna bartend this kid a drink he'll never forget . . . hehehe . . . .

26   Heikkila: hehehehehehehehe do it

27   Martin: Is it really a dick move to fuck with a guy knowing the only thing he
     did wrong was stealing the hottest girl away from everyone?….

28

1    Martin: Fuck…So that's five bottles of rat poison I have to buy.

2    Heikkila: Is that what you're calling it? Lol

3    Martin: …Yes.

4    Heikkila: The spencer drink?

5    Martin: Hella yo bro

6    Heikkila: Lol awesome

7    Martin: The Spencer: 1 whole bottle of Magnesium Citrate,[13] Sprite, and
     vodka.
8
     Heikkila: Hehehehehehe
9
     Martin: God damn. There's gonna be so much shit everywhere. And
10   girlfriends taken away.

11   Heikkila: More pussy for us
     Martin: Aight. So I'll get 10 bottles.….
12
     Heikkila: And fuck those dudes.
13
     Martin : Aight…We discretely mix the cups. I'll hand them out to people. And
14   make sure they drink them. And then bam. We profit.

15   Heikkila: No wait. We get a jug. Call it "special juice". Only guys can drink
     it. Nick Cody you and I are exempt.
16
     Martin: Sweet.
17
     (*Id.* at 12-13)
18

19       The following are excerpts of some of Heikkila's relevant Tweets that were sent on

20   or about the dates listed below:

21       October 20, 2013: I would say I'm sorry, but I'm not.

22       November 25, 2013: Fuck the police.

23   (*Id.* at 15)

24       While the Court recognizes that the law presumes each of the Defendants is innocent

25   of all charges, the Court finds that the second § 3142(g) factor strongly favors detention

26   because convictions are highly likely.

27   _____

28       [13] According to the Government, magnesium citrate is commonly used as a laxative.

**3.   History and Characteristics of Each Defendant, Character, Physical and Mental Condition, Family Ties, Employment, Financial Resources, Length of Residence in the Community, Community Ties, Past Conduct, History Relating to Drug or Alcohol Abuse, Criminal History, and Record Concerning Appearance at Court Proceedings**

## A. Martin

Joseph Simon Martin was born and raised in Rodalben, Germany. (Sealed doc. 19 at 2)  Until very recently, his parents, both U.S. citizens, lived in Germany. His father, retired from the United States Air Force, and mother were employed as school teachers by the Department of Defense and taught at an American school in Germany. Martin's mother retired at the end of May 2014. (*Id.*)  Martin informed PTS that he has daily contact with his parents and maintains a good relationship with them. He is one of four children born to this marriage and has siblings residing in Surprise, Arizona; Montgomery, Alabama; and Germany and has weekly contact with them. According to his attorney, Martin has three adult siblings living in the Phoenix area. (Doc. 17 at 3)  For most of his life, Martin has lived with, and has been supported by, his parents and has no financial resources other than the support he receives from his family. (*Id.*)

In December 2013, Martin moved from Germany to a residence in Peoria, Arizona, which is owned by his parents, to attend Glendale Community College ("GCC"), where he lived until finishing the semester at GCC, when he returned to Germany on or about May 14, 2014. (*Id.*; doc. 17 at 3)  Martin's sister, Cybil, who lives in Surprise, Arizona, and is employed as a registered nurse at Banner Good Samaritan Medical Center, has offered to let Martin live with her if he were released. The Court and PTS view Martin's sister as an appropriate third-party custodian, if he were released on conditions. According to Martin's attorney, Martin was raised a Catholic, regularly attends mass, and, according to information provided by his family, maintains strong bonds with his parents and family, and "is very close to both of his parents and to all of his siblings." (Doc. 17 at 3)

Martin was issued a United States Passport in 2010, but it was seized by the arresting agents in Germany. (Sealed doc. 19 at 2)  His "common access card" ("CAC") remains in

Germany.[14] Martin informed Pretrial Services that, while residing in Germany, he traveled with his parents to Paris, Portugal, Philippines, Spain, and Switzerland on family vacations. (*Id*.) Martin was employed at Ramstein Air Base, from 2011 to 2013, as a cashier at the base exchange, and resigned from this employment, when he moved to Peoria, Arizona, to attend GCC. According his mother, Martin is registered for fall classes at GCC, beginning in August 2014. (*Id*.)

Martin's mother disclosed to PTS that Martin suffers from depression and Attention Deficit Disorder ("ADHD"), which was diagnosed at age nine, and he was prescribed Concerta for his symptoms. (*Id*. at 3)  Martin's mother further advised that, to her knowledge, he last consulted with his mental health therapist in November and December 2013, but he is not prescribed any medications. She informed PTS that he "lacks social and life skills." (*Id*.) Martin's mother further informed PTS that Martin "[c]onsumes alcoholic beverages at her residence. . . [and] she or her husband are present when [he] consumes alcohol[, but he] does not consume alcohol in excess." She is unaware if Martin consumes alcoholic beverages when he is not in her presence, and "[t]o her knowledge, [he] does not use illicit drugs."  When PTS drug tested Martin after his arrest and arrival in Phoenix, he tested positive for marijuana.

Martin has no criminal record. (*Id*.)  Martin's attorney represents that, based upon his investigation, Martin has never had other criminal charges filed against him (dismissed or resolved) and there are no arrest warrants or failures to appear pending in any court. (Doc. 17 at 5)

The Government voluntarily disclosed at the detention hearing that Martin subsequently apologized to Jane Doe in a Facebook exchange between them.[15]

---

[14] A CAC card is a "smart" card about the size of a credit card and "[i]s the standard identification for active duty uniformed service personnel, Selected Reserve, DoD civilian employees, and eligible contractor personnel." *See* www.cac.mil/common-access-card (last viewed on June 9, 2014).

[15] Below is the relevant Facebook exchange identified in the search warrant affidavit in a District of Arizona search warrant, No. 14-217MB, issued by Magistrate Judge Michelle

**B. Heikkila**

Christopher John Heikkila, II, was born to Heather Harker and Christopher John Heikkila, in Tucson, Arizona. (Sealed doc. 18 at 2)  Heikkila lived in Tucson, from birth to 1996; in Hopkins, Minnesota, from 1996 to 2002; in Tucson, from 2002 to 2007; and in Germany with his mother and step-father, Wayne Harker, since 2007. (*Id.*)  Until his recent arrest, Heikkila was employed as a civilian employee for the United States Air Force at the base exchange. Heikkila graduated from high school in Germany in 2012 and is attending the University of Maryland, University College, apparently online. Heikkila stated he has good relationships with his entire family and converses with them frequently, has never married and has no children. (*Id.*)

Heikkila has been issued a United States Passport, but he informed PTS that it is located at his residence in Germany. He represents he does not have a CAC card. Since

---

H. Burns on May 6, 2014, ¶ 33, at pp. C-16 -17:

> [Jane Doe]: Oh I dunno. I don't remember most of that night. The last thing I remember is talking to my friend Zacchaeus. Ask CJ?
>
> Martin: So do you actually remember anything else?
>
> [Jane Doe]: I remember like, flashes of it.
>
> Martin: What do you remember mostly?
>
> [Jane Doe]: Being in a car
>
> Martin: Oh . . . And like I'm really sorry if you're not okay with talking about this.
>
> [Jane Doe]: It was a little traumatic, to be honest.
>
> Martin: Why?
>
> [Jane Doe]: Because I didn't want to do that with you, I was extremely drunk.
>
> Martin: *I'm sorry. That's not how I wanted it to be. If you have anything you need to talk about you can always reach me.*

(emphasis added).

residing in Germany, Heikkila reports that he has traveled to London, France, Italy, Belgium, Austria, and Mexico. (*Id.*)

If released from custody, Heikkila's biological father, who resides in St. Michael, Minnesota, and Heikkila's maternal grandmother, Cheryl Barnes, who lives in Tucson, are each willing to act as his third-party custodian. (*Id.*) Heikkila's father is, and has been, employed as a manager for TCF National Bank for the past 16 years. Heikkila's grandmother is retired from the University of Arizona after 35 years of employment. (*Id.*) Because Heikkila's grandmother resides approximately 1000 feet from Santa Rita High School and considering the nature of the pending charges, she is ruled out as an appropriate third-party custodian. The Court and PTS, however, view Heikkila's biological father as an appropriate third-party custodian, if Heikkila were released on conditions.

Heather Harker verified that her son is in good health and, like Martin, also has ADHD. (*Id.* at 3)  Heikkila informed PTS that he is not prescribed medications. Except for the ADHD, Heikkila has no history of mental health issues. (*Id.* at 4)  He claims he did not begin consuming alcohol until age 17, "[c]onsume[s] two to three alcoholic beverages on three occasions per week," but refused to discuss his marijuana usage. (*Id.*) Heikkila's mother informed PTS that Heikkila has admitted to her he has used marijuana in the past. Heikkila voluntarily submitted to drug testing on May 23, 2014, and the results were negative. Like Martin, Heikkila has no criminal history.

The background information provided by Defendants' family members to PTS describes two dramatically different young men and their characters than what is learned by reading their Facebook and Twitter messages to each other. In their Facebook messages detailed in this Order, Defendants, self-described by Heikkila as "The Rape-y Bros," show their 1) disdain[16] and disregard for law enforcement and criminal laws enacted and enforced

---

[16] On November 7 and 8, 2013, Defendants had the following Facebook exchange after Defendants were interviewed by law enforcement in Germany:

Heikkila: No more talk about it on here. Like at all . . . No. Nothing on the

1  to protect young women from sexual assaults and statutory rape (*e.g.*, Heikkila: Nigga I ain't

2  worried about nothing) (Martin: I wish I had a [rape] lair.); 2) chauvinistic and salacious

3  attitudes toward young girls with an unusual and unhealthy fascination about forceful sex

4  with underage and unsuspecting victims (*e.g.*, Martin: I'm gonna get all the pussy at the

5  party. Drunk girls are dtaf. Down to assfuck. I have time to fuck a high school bitch.), and

6  expressing regret for not raping other underage victims (*e.g.*, Heikkila: I wish I had fucked

7  [FEMALE MINOR's NAME REDACETD] when I had the chance. That way we both

8  could've raped an under age [sic] girl.). Are these Facebook messages simply expressions

9  of adolescent sexual bravado between immature males, the real thinking of two young sexual

10  predators who were caught at age 19, or a mixture of both?

11  The Court finds that, after considering all the third detention factors in § 3142(g),

12  these factors neither favor detention nor release with appropriate conditions of release.

13  **4. Nature and Seriousness of the Danger to Others if Defendants Are Released**

14  There is no evidence that prior to this party in October 2013 that Defendants had

15  engaged in any criminal conduct regardless whether charges were filed. Neither Defendant

16  has a criminal record of any kind or a record of ever being arrested before they were arrested

17  in this case. There is no evidence that they provided rat poison or a "magnesium citrate

18  cocktail" to any unsuspecting partygoers as they discussed in Facebook exchanges. The fact

19  that one or both of them may have smoked marijuana as a teenager does not alone render

20  either of them too dangerous, at home or abroad, if released. Moreover, with Jane Doe living

21  in Germany, their release to third-party family members living in Arizona and Minnesota

22  would pose no risk of danger to Jane Doe if Defendants were released with travel restrictions.

23  _____

24  internet. So these assholes [law enforcement] can't use anything else against

25  us . . . I suggest that you too go back through all of our messages from October 19, till now. Just to educate yourself on what we said.

26  Martin: Fuck…We talk too god damn much.

27  Heikkila: I know lol.

28  Heikkila: Yeah man. I think its funny they're watching us.

1    The Court concludes that the last detention factor weighs in favor of Defendants'

2    release on conditions.

3    **V. Discussion**

4    Considering Defendants are U.S. citizens, have substantial ties to close family

5    members living in Arizona and Minnesota, and have no prior criminal histories, the Court

6    finds that each Defendant has rebutted the statutory presumption that no condition or

7    combination of conditions will reasonably assure the safety of the community and the

8    appearance Defendants as required. *See* 18 U.S.C. § 3142(e)(3)(E). This presumption,

9    however, is not erased; "[r]ather the presumption 'remains in the case as an evidentiary

10   finding militating against release, to be weighed along with other evidence relevant to factors

11   listed in § 3242(g).'" *Hir*, 517 F.3d at 1086. The Court further finds that the Government

12   has failed to demonstrate by clear and convincing evidence that Defendants are too

13   dangerous to be released.

14   The Court finds the Government has an extremely strong case against Defendants and

15   convictions are highly likely if the case goes to trial. In these circumstances, the Ninth

16   Circuit allows a district court to consider possible punishment to gauge a defendant's

17   motivation to flee if released. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir.

18   1990) ("[T]he defendants are charged with multiple counts, and it is reasonable, from their

19   perspective, to look at the potential maximum sentences they face if they were found guilty

20   on each count and sentenced consecutively on each count. . . Facing the much graver

21   penalties possible under the present indictment, the defendants have an even greater

22   incentive to consider flight."). The Court will attempt to calculate the length of a likely

23   prison sentence, using the 2013 U.S. Guidelines Manual.

24   The Government's Post-Hearing Memorandum in Support of Motion for Detention

25   postulates three separate sentencing Guideline calculations. (Doc. 30) Assuming Defendants

26   go to trial and are convicted, the following preliminary calculations, including relevant

27   enhancements, may apply:

28   **A. Total Offense Level.**

The Total Offense Level could be a level 39, calculated as follows:

| Guideline | Description | Level |
|-----------|-------------|-------|
| 2A3.1(a)(2) | Base Offense Level: | 30 |
| | Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse | |
| 2A3.1(b)(1) | Specific Offense Characteristic: | + 4 |
| | Offense involved conduct described in 18 U.S.C. § 2241(b) | |
| 3A1.1(b)(1) | Vulnerable Victim Adjustment[17] | + 2 |
| | | ___ |
| Total Offense Level: | | 36 |

### B. Criminal History Category

Based on Defendants' lack of criminal history, the Government and the Court presume each Defendant falls within Criminal History Category I.

### C. Calculation of Guidelines Range

Using the U.S.S.G. § 5A Sentencing Table, each Defendant is facing an estimated Guideline sentence of 188-235 months in the Bureau of Prisons, without considering other upper or downward departures or variances. (*Id.* at 2-3)  For example, the Government notes that Application Note 6 for Section 2A3.1 of the Sentencing Guidelines may result in an upward departure if the victim was sexually abused by more than one participant. (*Id.* at 3)

While defense counsel agree that the advisory Sentencing Guidelines and preliminary estimates which the Government has referenced might apply for convictions of the specific crimes listed on the face of the indictment, they "[d]o not concede that a factual basis exists to support a conviction on any of the counts or that facts exist to justify the addition of any

---

[17] The Government's memorandum indicates "a vulnerable victim adjustment could be applied based on the victim's age and her intoxication; however, the Government acknowledges the adjustment likely would be disputed and the [assigned District Judge] ultimately would decide the applicability of the adjustment after weighing the evidence in the case." (Doc. 30, at 2 fn. 3)

enhancements." (Doc. 31 at 1) The Court reiterates that this Guideline calculation is a preliminary estimate only, offered here solely to determine its impact on Defendants' state of mind if they were released from custody.

## VI. Conclusion

The Court finds that each of the Defendants is a serious flight risk and no combination of release conditions will reasonably assure their appearances at future court proceedings if either were released from custody. The section 3142(g) detention factors weigh against Defendants' release. The evidence against them is overwhelming on very serious premeditated felonies. Each Defendant is experienced in traveling in Europe, has ties to Germany, suffers from ADHD, does not presently take medication for it, and has demonstrated by their Facebook posts that each of them has no respect for law enforcement (*e.g.*, Heikkila: "Fuck the police"), lawful authority, and young women. After the alleged sexual abuse of Jane Doe, and except for Martin's Facebook apology to her, they have shown no remorse in their Facebook exchanges to each other for their predatory conduct (*e.g.*, Heikkila: "I would say I'm sorry, but I'm not."), have boasted about being "The Rape-y Bros!," and Heikkila thought it was "funny they're [law enforcement] watching us."

The Court concludes that the Government has met its burden of persuasion by a preponderance of the evidence that no condition or combination of conditions will reasonably assure either Defendant's appearance at trial and future court proceedings if released. *See Hir*, 517 F.3d at 1091 ("We conclude that [defendant's] history as a law-abiding citizen and his significant ties to the local community do not outweigh the extremely serious nature of the offenses with which he is charged[.]") (citing *United States v. Rodriguez*, 950 F.2d 85, 89 (2nd Cir. 1991) (explaining that "[a]lthough a prior record of violence eases the government's burden of showing dangerousness, it is not essential . . . to prove dangerousness by clear and convincing evidence."); *United States v. Abad*, 350 F.3d 793, 798 (8th Cir. 2003) (although the defendant had no prior criminal history, the nature of the crime charged - sexual activity with a minor - weighs heavily against release where strong evidence links the defendant to this crime of violence).

1   As the district judge correctly noted in *O'Field*,

2      This court is mindful of both the presumption of innocence carefully and
       properly considered by the Magistrate Judge, and of the constitutional issues
3      raised by O'Field's able counsel. However, pre-trial detention under federal
       law is regulatory in nature, and does not constitute punishment before trial in
4      violation of the Due Process Clause. *United States v. Jarvis*, 299 Fed.Appx.
       804, 807 (10th Cir. 2008) (quoting *United States v. Salerno*, 481 U.S. 739, 748
5      (1987); *Bell v. Wolfish*, 441 U.S. 520, 535, 99 (1979)); *see* 18 U.S.C. § 3142(j)
       ("Nothing in this section shall be construed as modifying or limiting the
6      presumption of innocence.").

7
   2009 WL 920734, at *4.
8
      Based on the foregoing,
9
      **IT IS ORDERED** that the Government's Motion for Detention and Removal to the
10
   United States, docs. 10, 16, is **GRANTED**. Defendants shall remain detained pending trial.
11
      **IT IS FURTHER ORDERED** that Defendant Christopher J. Heikkila's Motion for
12
   Pretrial Release, doc. 20, is **DENIED**.
13
      Dated this 10th day of June, 2014.
14

15

16                                    Lawrence O. Anderson
                                      United States Magistrate Judge
17

18

19

20

21

22

23

24

25

26

27

28



**Recipients**  Joey Martin (633202959)
CJ Heikkila (100001006114655)

